UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

WILLARD JOHN ALLEN,           )
                                     )
      Movant,               )
                                     )
v.                                   ) Civil No. 08-329-P-S
                                   ) Crim. No. 04-08-P-S
UNITED STATES OF AMERICA,    )
                                   )
      Respondent       )

**RECOMMENDED DECISION ON 28 U.S.C. § 2255 MOTION AND
ORDER ON MOTION TO CONSIDER ATTACHMENTS**

Willard John Allen is serving a 360-month sentence for federal drug charges.  He has filed a 28 U.S.C. § 2255 motion pressing multiple claims of ineffective assistance challenging the representation by his trial attorneys, his sentencing attorney, and his appellate attorney.  The United States has filed a memorandum opposing Allen's request for 28 U.S.C. § 2255 relief.  Allen has filed a reply and a request that the court consider certain attachments.  I now grant Allen's motion for consideration of the attachments (Doc. No. 21).

With respect to the 28 U.S.C. § 2255 motion, I entered an order requesting that the United States supplement the record with respect to Allen's 1995 drug conviction alleged in the 21 U.S.C. § 851 information, foiled on the eve of Allen's trial.  The United States has filed a response to this order and Allen has filed a reply to the supplementation.  I now recommend that the Court deny Allen 28 U.S.C. § 2255 relief.

## DISCUSSION

### I.      SECTION 2255 REVIEW

All of Allen's claims involve an assertion of ineffective assistance of counsel.  The First

Circuit summarized the standard for 28 U.S.C. § 2255 ineffective assistance claims in <u>United

States v. De La Cruz</u>:

> The essence of an ineffective-assistance claim is that counsel's
> unprofessional errors so upset the adversarial balance between defense and
> prosecution that the trial was rendered unfair and the verdict rendered suspect.
> <u>Kimmelman v. Morrison</u>, 477 U.S. 365, 374 (1986). In order to prevail, a
> defendant must show both that counsel's representation fell below an objective
> standard of reasonableness and that there exists a reasonable probability that, but
> for counsel's unprofessional errors, the result of the proceeding would have been
> different. <u>Strickland v. Washington</u>, 466 U.S. 668, 688, 694 (1984). In other
> words, a defendant must demonstrate both seriously-deficient performance on the
> part of his counsel and prejudice resulting there from. In this case, Defendant has
> demonstrated neither.
>           Although the Supreme Court in <u>Strickland</u> discussed the performance
> prong of an ineffectiveness claim before the prejudice prong, the Court made
> clear that "there is no reason for a court deciding an ineffective assistance claim to
> approach the inquiry in the same order or even to address both components of the
> inquiry if the defendant makes an insufficient showing on one." <u>Id.</u> at 697. As the
> Court noted: "If it is easier to dispose of an ineffectiveness claim on the ground of
> lack of sufficient prejudice, which we expect will often be so, that course should
> be followed." <u>Id</u>

514 F.3d 121, 140 (1st Cir. 2008)

### A.      Motion to Consider Attachments

Pending is a motion by Allen requesting that this Court consider his attachment to his

form 28 U.S.C. § 2255 motion.  This motion was necessitated by the United States' insistence in

its opposition memorandum that this court should not consider the content of these attachments

that were appended to his § 2255 motion when filed and referenced in the sworn portion of his

§ 2255 form motion because Allen has not signed, much less provided an oath, on the

2

attachments themselves.  (Gov't Opp'n Sec. 2255 Mot. at 13-14.)  I now grant Allen's motion.

(Doc. No. 21.)   I also advise the United States that my practice has been to treat expressly

incorporated attachments like this, when submitted simultaneously with the sworn 28 U.S.C.

§ 2255 form motion, as if they were covered by the oath provided on the form motion and I will

continue to do so unless a reviewing court directs that it is impermissible to do so.  I do not read

United States v. LaBonte, 70 F.3d 1396, 1413 (1st Cir. 1995) as dictating that I do otherwise.[1]

## II.    FACTUAL BAKCGROUND

The First Circuit Court of Appeals summarized the facts behind and players involved in

Allen's arrest as follows:

> On the morning of January 4, 2004, Agents Roland Godbout and Matt Cashman,
> both of the Maine Drug Enforcement Agency ("MDEA"), received a tip from an
> informant that an individual named "Curt" was selling crack cocaine out of the
> Morningstar Motel on Lisbon Street in Lewiston, Maine. After surveilling the
> motel from across the street for a couple of hours, Agents Godbout and Cashman
> saw two individuals, later identified as David Moody and Jeff Dillingham, arrive
> at the motel in an Izusu Trooper and enter room number twelve. Approximately
> ten minutes later, Moody and Dillingham emerged from the room and drove off in
> the direction of downtown Lewiston. As the agents followed, the Trooper rapidly
> accelerated to speeds outside the legal limit, prompting the agents to instruct a
> uniformed police officer to make a traffic stop. Moody was immediately arrested
> for driving with a suspended license; Dillingham was detained and, after a little
> posturing, admitted that he had bought crack cocaine from Curt at the
> Morningstar Motel.
>
> That afternoon, with Dillingham's confession in mind, Agents Greg
> Boucher and Barry Kelly surveilled the Morningstar with particular scrutiny on
> room twelve. At approximately 3 p.m., Kelly saw a white male (later identified as
> Allen) pull up to room twelve in an Izusu Rodeo, enter the room, and return to the
> Rodeo with a black male (later identified as Curtis Thurman, a.k.a "Curt"). Reilly
> observed each man carrying a dark-colored duffel bag. Like Moody and
> Dillingham earlier, the Rodeo drove out of the parking lot and headed toward
> downtown Lewiston. The agents followed in their unmarked vehicle and observed
> that the Rodeo was driving "erratically," that is, swerving, speeding, and signaling
> inconsistently. Based on these factors, the agents believed that Allen and

---

[1]    As the United States is aware, this practice does not mean that I always treat the content of these
attachments as relevant to or cognizable evidence of the merits of a movant's § 2255 claims.

Thurman were making a "heat run" by deliberately attempting to avoid police detection and surveillance. Within approximately two minutes after leaving the motel, the agents requested that uniformed Lewiston police officers stop the Rodeo.

After effectuating the stop, the uniformed officers ordered both the driver and passenger out of the vehicle. The officers handcuffed both men and placed them in separate cruisers. At this point, Agent Godbout and Agent Kelly arrived on the scene, went to the cruiser in which Allen was placed, and read Allen his <u>Miranda</u> rights. Allen acknowledged that he understood his rights and then agreed to speak with the agents.

Agent Kelly began by asking Allen if there were any drugs in the Rodeo, to which Allen replied that he did not have any drugs but that, hypothetically speaking, if drugs were in the vehicle they would be in a black duffel bag in the back. When asked why he thought that, Allen, gesturing to a particular black duffle bag, stated that the bag was Thurman's and that Thurman had prohibited him from touching it. The agents then asked Allen for consent to search the vehicle and Allen agreed, stating, "Yeah, go ahead, I've got nothing to hide."

The agents enlisted Agent Morin to search the vehicle with his drug-detection dog. Not surprisingly, after the dog had been commanded to search for drugs it alerted to the black duffel bag in the rear of the vehicle that Allen had hypothetically singled out. The agents searched the bag and found a substance that field-tested positive for cocaine, a receipt in Thurman's name from the Morningstar, $225 in cash, and a digital scale.

<u>United States v. Allen</u>, 469 F.3d 11, 13 -14 (1st Cir. 2006).

## III:  ALLEN'S THREE CLUSTERS OF SIXTH AMENDMENT CLAIMS

### A.  Trial counsel

### 1.        Performance regarding plea options

In his first 28 U.S.C. § 2255 ground, Allen maintains that the attorney representing him in the pre-trial proceedings was constitutionally deficient in addressing an opportunity to enter into a plea agreement.  (Sec. 2255 Mot. at 8, "Attachment A.")  He explains:

> During the pretrial proceedings, at some point, a plea offer was communicated to trial counsel.  The only time trial counsel notified the defendant of a possible plea negotiation was a passing reference that "the Government was offering a plea and [counsel] informed the Government we are going to proceed to trial."

(Id.)  Allen explains that he later found out that the plea offer was based on an incorrect assumption that the 21 U.S.C. § 851 crimes charged in the information were felony convictions when in fact they were misdemeanors. (Id.)  Allen believes that if counsel had acted diligently to ascertain why the United States was making such an unreasonable plea offer, explained it to Allen so he could clarify the facts, and then presented the correct facts to the prosecutor, counsel could have obtained a favorable plea offer which Allen would have accepted.  (Id.)

In his reply memorandum, Allen explains that the plea offer was made on the assumption that two of Allen's prior convictions were felony drug convictions when in fact they were misdemeanors under Maine law for which Allen was subjected to a term of imprisonment of less than a year.  (Reply Mem. at 4.)  Had counsel explored this with Allen he could have negotiated a better plea agreement and thereby have obtained a reduction for acceptance of responsibility. (Id.)

In its answer to the §2255 motion the United States urges that Allen's report of the statement by Allen's attorney to him about the plea offer is hearsay.  The second problem the United States pointed to in their initial analysis of the claim is that Allen had generated no evidence the prior convictions charged in the enhancing indictment were misdemeanors rather than felonies.  The United States further maintains that Allen's assertion that a plea offer was made is not creditable, as he has failed to identify which Assistant United States Attorney allegedly made the offer, under what circumstance, and with what concession or concessions on the part of the United States.  (Gov't Opp'n Sec. 2255 Mot. at 17.)  It describes Allen's scenario concerning how his attorney could have convinced the United States to enter into a favorable plea agreement as "rank speculation," noting: "Nothing in the record remotely suggests that the Government was interested in any plea agreement with Allen, who not only was by statute

5

subject to an enhanced punishment, and qualified as a Career Offender, but also testified at the

suppression hearing in a manner the Magistrate Judge expressly found to be incredible."  (Id.)

In my order to supplement as to this aspect of Allen's § 2255 motion, I indicated:

The 21 U.S.C. § 851 "Information Charging Prior Convictions" identified Allen's
1995 conviction in the Androscoggin Superior Court on two counts of furnishing
scheduled drugs.  (Crim. No. 04-08-P-S, Doc. No. 150.)  The information
implicitly asserted that these qualified as felony drug trafficking offenses under
21 U.S.C. § 802, which defines the term "felony drug offense" as a crime
"punishable by imprisonment for more than one year."  Paragraph 27 of the PSI
lists the November 20, 1995, conviction for Furnishing Scheduled Drugs,
indicating that it was a Class D offense. (PSI ¶ 27.)  It represents that Allen was
sentenced to six months and one day, to be served concurrently with his sentence
on a burglary conviction reflected in Paragraph 26 of the PSI.  (Id.)  It further
describes the conduct: "Records reflect that the defendant provided marijuana to
…two minor children."  (Id.)
         In its memorandum seeking dismissal of Allen's 28 U.S.C. § 2255 motion,
the United States cites to 17-A M.R.S. § 4-2(D) as the applicable statutory
provision for identifying whether the offense listed qualifies as a 21 U.S.C. § 802
prior conviction.  Section 4-2(D) pertains to non-code offenses.  Title 17-A,
section 1252 of the Maine Revised Statutes sets forth the penalty provisions for
code crimes other than murder.  Therein, a Class D crime allows the court to set a
sentence of "a definite period of less than one year."
         It is not possible for the Court to address this aspect of Allen's 28 U.S.C.
§ 2255 motion without supplementation of the record by the United States as to
how it arrived at the conclusion that this state furnishing offense was a felony
offense warranting enhanced penalties under 21 U.S.C. § 841(b)(1)(A).
Preferably this supplementation will include a copy of the charging documents for
the furnishing offense(s) identifying the statutory provision under which Allen
was charged.  At a minimum the United States should identify for the court the
state statutory provision under which Allen was charged for the furnishing
offense(s).

(Doc. No. 22.)

The United States has responded to this motion to supplement by conceding that the 1995

offenses alleged in the information "ultimately resulted in convictions for misdemeanors rather

than felonies; and they could not have been used to enhance Allen's sentence under 21 U.S.C.

§§ 851 and 841(b)(1)."  (Gov't Resp. Order Suppl. at 2; see also id. at 3; Crim. No. 04-08-P-S,

Doc. Nos. 240-6 & 240-7.)  It indicates that its understanding is that these documents were received by the U.S. Attorney's Office from the Probation Office on September 13, 2005, about nine months after the § 21 U.S.C. §851 information was filed and that they were filed with the Court more than one month prior to Allen's sentencing.  (Id. at 2 n. 1.)  "Indeed," the United States now represents, "neither the Government nor the Probation Office, defense counsel or the Court ever suggested that the enhanced penalties in 21 U.S.C. § 841(b)(1)(A) should be applied to Allen at sentencing."  (Id. at 3)(emphasis added).  It explains:

> PSI ¶27 described the offenses alleged in the Information correctly as a Class D crime. Neither the Government nor defense counsel objected to that classification. The PSI also described Allen's 40 other convictions, which produced eight criminal history points and put him in criminal history category (CHC) IV (PSI ¶¶26-42). Allen had three convictions for crimes of violence: a 1995 burglary (PSI ¶26; Crim.Docket #240-3); and 1999 convictions for assault and witness tampering (PSI ¶35; Crim.Docket #240-5). Thus, he qualified as a career offender under USSG § 4B1.1, which produced a base offense level 37 and CHC VI (PSI ¶43). The resulting Guideline range was 360 months to life (PSI ¶66). It was Allen's career-offender status, not the § 851 Information, that drove his sentence.
>
> ….
>
> The Government never suggested to the sentencing judge that an enhanced penalty should be applied based on Allen's prior drug convictions or any other factors. Indeed, to the contrary, the Government recommended a 360-month sentence – – the bottom of the Guideline range (Crim.Docket #254, S.Tr. 22, 27). Nor did the Court ever intimate that it had considered Allen's prior drug convictions to be a basis for an enhanced statutory sentence (Crim.Docket #254 ). It did, however, find that Allen was a career offender, with BOL 37, CHC VI and Guideline range of 360 to life (Crim.Docket #254, S.Tr. 30-32). The Court explained that the offense also carried "a mandatory term of incarceration of 120 months as imposed by statute 21 U.S.C. section 841(b)(1)(A)" (Crim.Docket #254, S.Tr. 32). Ten years was the un-enhanced statutory mandatory minimum that applied without consideration of prior felony drug offenses. The Court similarly concluded that the un-enhanced minimum term of five years of supervised release applied to Allen (Crim.Docket #254, S.Tr. 32). It also acknowledged authority to grant a departure from the low end of the Guideline range (Crim.Docket #254, S.Tr. 33), which would not have been possible if the two drug convictions were used to invoke the mandatory life term. The Court imposed a low-end 360-month Guideline sentence, with the previously filed

Information having had no impact whatsoever on the parties' recommendations or ultimate sentence.

(Id. at 3-5) (footnote omitted).

In this response to the order to supplement the United States reiterates that Allen's assertion that he might have secured a more favorable plea agreement had his attorney ferreted out the "erroneous characterizations" of his prior conviction in the information is "vague and speculative." (Id. at 5.) It points out that Allen informed the Court at sentencing: "There were no offers of any type of plea agreement in this case at all…" (id. at 5-6, citing Sentencing Tr. at 25.) The United States omits that Allen finished this thought by stating, "because I would have considered a reasonable plea offer, as I know I'm not perfect." (Sentencing Tr. at 25.) Without denying that any offer was made by a prosecutor in the United States Attorney's Office, the United States describes Allen's claim that "the Government made an offer that trial counsel rejected and conveyed to Allen only in passing" as "at best specious." (Gov't Resp. Order Suppl. at 6.)[2]

I am not entirely convinced by the United States' assertion that the filing of the 21 U.S.C. § 851 information with the mistaken representation that Allen had been convicted of two felony drug offenses was innocuous in terms of the pre-trial dynamics of the case, else wise why go to the bother? This Court is all too well aware that many criminal cases plead out on the eve of trial. Without convening an evidentiary hearing to ascertain what may or may not have been conveyed between the prosecutor and defense counsel it is not possible to say for certain whether or not there was room for negotiation at this juncture had defense counsel consulted with Allen and challenged the representations of the information. For all I know, Allen might have told his

---

[2] The same Assistant United States Attorney who represented the United States at trial has filed the response to the order to supplement in this 28 U.S.C. § 2255 proceeding so she presumably has first-hand knowledge of this facet of Allen's criminal case.

8

attorney he wanted to proceed to trial, no matter what sort of plea agreement could have been negotiated. Or, it might have been that defense counsel was told that the United States was recommending life in prison because of the alleged two prior felony drug convictions and trial counsel did not bother to challenge that position at all in spite of clear instructions from his client to try to negotiate a reasonable plea. Thus, in the absence of an evidentiary hearing it is really impossible for me to make an assessment of trial counsel's level of performance during this phase of the proceedings.

However, Allen's career offender status was the tail that wagged the dog vis-à-vis Allen's ultimate sentence and this would have been the case even if Allen did enter into a plea agreement with the United States. If Allen had pled guilty he would have been eligible for a three-level reduction for acceptance of responsibility under U.S.S.G. § 3E1.1. If Judge Carter had decided this reduction was appropriate, Allen would have had an adjusted offense level of 31 that translated into a total offense level of 34 rather than 37. With this offense level and a criminal history category of VI his sentencing range would have been 262 to 327, rather than the 360 months to life reflected in PSI ¶ 66.

This recommended decision will not be reviewed by the sentencing judge, who has since retired. If there is a concern under the Strickland prejudice prong it would be this possibility of an acceptance of responsibility reduction had Allen chosen to plead guilty and the sentencing judge is the person best able to answer that question. See United States v. McGill, 11 F.3d 223, 225 (1st Cir. 1993). (See also Sentencing Tr. at 31.) Taking into consideration the overall complexion of Allen's criminal history, at this juncture it appears remote and speculative to suggest that competent plea negotiations conducted prior to trial would have likely changed the outcome of the sentencing hearing in any measurable way. However, I do think that the United

States has been a bit too glib in dismissing the possibility that this ground has any merit given the fact that Judge Carter was well aware that Allen put the United States to its proof at trial and, nevertheless, sentenced Allen to the lowest range of his offense level.  However, in order to embrace Allen's theory that he was prejudiced by counsel's alleged failure to properly investigate his criminal history and then engage in meaningful plea negotiations prior to trial, this court would have to accept the notion that Allen would have considered a sentence of more than twenty years to be a "reasonable plea negotiation."  I say this because there is absolutely nothing that would suggest that the Government would ever recommend or the court would have ever imposed any sentence in this case outside of the guidelines range. Even if Allen had pled guilty his guideline sentence would have been at least twenty years.   There is nothing in the record to suggest that the United States would have engaged in plea negotiations in the range of ten years, the sentence received by a co-defendant and probably desired by Allen, or that the sentencing judge would have imposed such a sentence had it been recommended to him.  Allen's submissions are notably vague and speculative as to what plea negotiations his trial counsel might have sought that would have brought Allen to the table prior to trial.  I conclude that even if trial counsel's performance prior to trial relating to the information is deemed deficient, Allen has not made a creditable showing of prejudice such as to warrant a resentencing.

> **2.     Failing to make proper discovery requests, demands, and motions**

Allen also faults his first attorney for failing or refusing to make the proper requests, demands, and/or motions for Jencks Act materials that could have been used during the suppression hearing.  (Sec. 2255 Mot. at 8, "Attachment A.")  If counsel had done so, Allen believes that he could have adequately cross-examined and impeached the agents with regards to their inconsistent and perjurious testimony as to the search of the vehicle and the description of

10

the seized narcotics.  (<u>Id.</u> at 8-9.)  Allen also faults counsel for not uncovering that the defense's

discovery request and the court's order had been violated when "rough notes" the prosecution

was ordered to produced were destroyed.  (<u>Id.</u> at 9.)

      In its opposition memorandum the United States correctly points out that this description

of this claim against trial counsel is entirely too conclusory.  (Gov't Opp'n Sec. 2255 Mot. at 18.)

<u>See</u> <u>David</u>, 134 F.3d at 478.   However, Allen expands on this statement of his claim in his reply

memorandum:

>       Because counsel could have filed motions requesting that handwritten
> notes that reproduced Petitioner's exact words to be available for use along with
> the Jencks Material consisting of any and all Agents testimony before the Grand
> Jury there is a reasonable probability  that the outcome of the proceeding would
> have been different, where it would have been disclosed that Agent Kelley's
> handwritten notes had been destroyed when there was a proper request and court
> "ORDER" that the government [would] direct all law enforcement agents to
> preserve their rough notes" (Docket # 59, 88). These notes would have
> corroborated Petitioner's Suppression testimony entirely, where there is clearly a
> dispute over the statements such as where Petitioner was headed, which Agent
> Godbout testified "toward Lisbon Street, 25 Lisbon street"  (Docket # 145 pg.16)
> which is the vicinity of where Petitioner was headed being "downTown" (Docket
> # 146 pg. 37), rather than to 25 Lisbon Street as testified to by Agent Kelly
> (Docket # 145 pg. 16).
>       Agent Kelley also testified that he asked [Petitioner] "to step out of the
> vehicle and point to the duffle bag which – which was what he was referring to.
> Then he pointed out a black duffle bag in the rear, the other being a green duffle.
> The green duffle bag, he said, I believe it had a Sony Playstation or games of the
> sort, he said was his.  And would be – be the other one, the black bag (Docket #
> 145 pg 38).
>       Although during trial Agent Kelley testified again identifying the same
> two bags, however he testified Petitioner "stated he had a duffle bag that was his,
> the green duffle bag.  He said there was one with a play station video game that
> had been placed in there"  (Docket # 209 pg. 247), which was also entered into
> evidence as EXHIBIT 4" during trial (Docket #209 pg. 61), showing that the
> black bag identified was **not** the one containing the cocaine base corroborating
> Petitioner's testimony (Docket # 146 pg. 25), which counsel failed to object to
> along with the fact that there were problems with the chain of custody being the
> drugs had been mislabled (Docket # 209 pg. 302).

(Reply Mem. at 5-6.)

11

In an attack on Kelley's general credibility, Allen stresses that Kelley "was found to have committed '**unprofessional** **conduct** **for** **a** **law** **enforcement** **officer**' per the testimony at trial." (Id. at 6.)  I have reviewed this portion of the trial transcript that pertains to a 2000 investigation into a financial scheme involving Kelley and other Lewiston Police officers – described by Kelley as a "changing lives pyramid scheme." The transcript reveals that Kelley had a hearing related to this conduct in which he was ordered to speak, he disobeyed that order, and was found to have done so by the department.  (Nov. 16, 2004, Trial Tr. at 230-35.)   It is Allen's contention that if the Magistrate Judge presiding over the suppression hearing was aware of these concerns the outcome of that hearing would have been different.  (Reply Mem. at 7.)

Inserting necessary specificity about a claim in a reply brief is decidedly not an approach that this Court countenances.  In the ordinary course, a 28 U.S.C. § 2255 movant must present his or her claims in the initial § 2255 motion and identify the factual support/basis for each claim.  See Rule Governing Sec. 2255 Proceedings 2(b).  This gives the Court the opportunity to undertake the preliminary review and allows the United States the opportunity to respond to all claims when ordered to do so.

However, even if I were to consider the particular arguments that Allen makes in his reply brief about counsel's performance on this score, the record of the suppression hearing convinces me that the outcome of this case would not have been different had counsel obtained Kelley's handwritten notes or pursued impeachment of Kelley concerning his rebuke by the department for failing to obey the order to speak.   In reaching this conclusion I have paid particular attention to the context of the testimony of Agent Godbout regarding the direction the car was moving prior to the search  (Aug. 24, 2004, Suppress Hr'g Tr. at 16)("I remember him talking about … he was headed toward Lisbon Street, 25 Lisbon Street.") and Agent Kelley's

12

testimony as it pertained to 25 Lisbon Street (id. at 38)("[A]fter he had said that he was headed to 25 Lisbon Street, he also said that he had dropped off an individual by the name of Karla at a Save-A-Lot, which is also located off Lisbon Street, towards 25, approximately one mile from 25 Lisbon Street, which, again, wasn't in the direction he was traveling.").  Further the record shows counsel's efforts to cast a shadow on the testimony by Kelley as to the identity of the duffle bag over which Allen had 'custody' and counsel's cross and re-cross examination vis-à-vis this testimony.  (Id. at 38, 43 -46.)   See also Allen, 469 F.3d at 14 (noting that the "magistrate judge discredited Allen's version of events (contending that he and Thurman were on their way to a laundromat) and endorsed the government's" version of events).

### 3.   Failure to preserve issues for appeal and not filing a motion for a new trial within seven days

In the third sub-claim against this attorney Allen contends that he failed to develop an adequate record for appellate review.  (Sec. 2255 Mot. at 9, "Attachment A.")  Allen identifies counsel's failure,

> to adequately cross-examine Agents and other witnesses, and to present exhibits with respect to the Government's statements that "I did not include evidence regarding the Summer Street location here…" and, "ladies and gentlemen, you hear a lot of approximation and you heard Patricia Poulin say: "Sometime last fall I was buying out  of 72 Summer Street" an address that I did not live at and brought to counsel's attention at that time, along with the fact no statements from Patricia Poulin were disclosed, and no other witnesses testified that they had been going to Summer Street.  Whereas trial counsel['s] failure to make critical objections and other procedural motion on my behalf has prejudiced the defendant of a fair and reliable trial.

(Id.)  This is a rather incoherent statement of a claim and does not give the United States much of a foothold apropos a response. In its answer to the motion, the United States does make the following attempt:

Allen's quarrel with the prosecutor's summation at trial about activities at 72 Summer Street fails in part because, on direct appeal, the appellate court reviewed the issue and found no plain error in the argument. See Allen, 469 F.3d at 16. That issue cannot be revisited on §2255. See Singleton v. United States, 26 F.3d 233, 240 (1st Cir. 1994). Insofar as Allen suggests that [defense counsel] unreasonably failed to prove that Allen did not live at 72 Summer Street, that issue was the subject of Allen's motion for a new trial, which was denied and the denial was upheld on appeal. That issue as well cannot be raised again on collateral challenge. See id.

(Gov't Opp'n Sec. 2255 Mot. at 19.)

Allen explains in his reply brief that his "quarrel" with the United States' reference during

summation to the Summer Street residence is,

that it was known by the government that Petitioner was not living at the Summer Street location testified to by any of the witnesses as the government stated during opening arguments that Petitioner "had moved out of the house he was renting, that he was renting his house to his sister"  (Docket #209 pg. 33), and the fact that the government clearly stated that it "did not included any evidence regarding the Summer Street location here and you will see why, because Jeff Dillingham did not give any evidence regarding the Summer Street location", clearly had either trial counsel … or Appellate counsel … raised this issue the outcome of the proceeding would have been different where the relevant issue "was not ownership of the house but whether the [Petitioner] was living at the house" to which the witnesses referred (United States v. Allen, 1st Cir. No. 08-1102).
Which is clear by Patricia Poulin's testimony that the Petitioner never answered the door at the Summer Street location (Docket # 209 pg. 321, 324[]). Patricia Poulin testified that she went to the Summer Street location "three" times and this is where she met a person by the name of Bucky, whom she only met as Bucky (Docket # 209 pg. 314, 321), who she testified was not present in the back room during any of the drug transactions.

(Reply Mem. at 8.)[3]

In his reply memorandum Allen further faults his trial attorney for not filing a timely

motion for a new trial when he was presented with copies of the deeds to both 72 and 84

Summer Street.  (Reply Mem. at 11.)  According to Allen, these deeds demonstrated that Allen

---

[3]      Allen also complains about the United States' treatment of the testimony of Curt Thurman as to where Thurman lived.  (Id. at 8-9.) This line of attack on counsel does not warrant discussion.

did not  "own that address and the government intentionally did not indicate a specific address on Summer Street, where it was known that Petitioner was renting out the house he owned on Summer Street during the time period of the conspiracy he has been convicted of."  (Id.)

It is clear to me that Allen has unduly magnified the importance of the United States' reference to the Summer Street location in it closing argument and that he overestimates the merits of the grounds he wanted counsel to raise in a timely motion for a new trial.  Placed in the context of the evidence that came in at trial, counsel did not perform below the Strickland threshold in refraining from interjecting an objection to this portion of the prosecution's closing.  See cf. Smothers v. McCaughtry, 418 F.3d 711, 714 (7th Cir. 2005).  The First Circuit's judgment on Allen's motion for a new trial buttresses my conclusion that there is no Strickland prejudice lurking here:

> Appellant claims that newly discovered documents showing that he does not own the home at 72 Summer Street indicate that a government witness committed perjury. However, the witness in question testified only that appellant lived on Summer Street. The only time "72 Summer Street" was mentioned at trial was in the prosecutor's closing statement; there was no defense objection. First, that statement was not evidence. Second, we do not see how adding a number to the "Summer Street" address discussed at trial could have had any effect on the jury. Appellant knew at the time of the trial whether or not he lived at 72 Summer Street and could have obtained evidence to establish the fact in a more timely manner, if he had viewed it as relevant. Finally, it was not ownership of the house, but whether appellant was living at the house on Summer Street referred to by the witnesses, that was relevant to the outcome of the case.

United States v. Allen, No. 08-1102, Aug. 15, 2008, J. (1st Cir.) (emphasis added).

### 4.    Allen's right to testify

Trial counsel is further faulted by Allen for precluding him from exercising his right to testify on his own behalf.  (Sec. 2255 Mot. at 9, "Attachment A.")   He explains that counsel had "introduced inconsistent positions" in the suppression hearing relative to that at trial which

effectively prevented Allen from taking the stand at trial.  (Id.)  In his reply brief Allen expands on this complaint, explaining that apropos the suppression hearing counsel argued that Allen's statement did not constitute consent, whereas at trial he tried to show that Allen expressly allowed the search of the car.  (Reply Mem. at 9.)  Allen maintains that he told counsel that he was presenting these inconsistent positions and that he needed to "correct the error" but counsel refused to do so.  (Id. at 9-10.)

The United States points out that the Court expressly advised Allen of his right to testify and the attendant danger of impeachment with his prior convictions. (Nov. 16, 2004, Trial Tr. at 84-85.)  Allen assured the court that he had freely decided not to testify, describing it as a "fully voluntary decision."  (Id. at 85.) This response somewhat misses the point of Allen's right to testify claim.  He is not asserting that he thought he should testify when the opportunity arose at trial; Allen is maintaining that the decision by counsel to present inconsistent theories of non-consent/consent vis-à-vis the search backed him into a corner in which he could not testify at trial.

When defense counsel cross-examined Agent Godbout at trial he pursued the following line of inquiry:

> Q. And you tell me that he gave consent to search the car; correct?
> A. Yes.
> Q. And he was not trying to hide anything, if he wanted to hide anything he could have told you not to search?
> … He cooperated? He said, you can search the car; correct?
> A. Correct.
> Q. And he didn't in fact tell you that he owned the drugs or possessed the drugs. He never told you those were his drugs; correct?
> A. Correct.
> Q. In fact he told you, upon Agent Kelly's questions, that he was unaware that there were any drugs in the vehicle; correct?
> A. Correct.

16

Q. And upon Agent Kelly's questions, "if there were drugs in your vehicle, where would it be?" Mr. Allen said, probably in the back; correct?
A. Correct.
Q. And he indicated that there might be drugs in the black bag, correct?
A. Correct.
Q. Later you learned from Mr. Allen that Mr. Allen, when he was helping Mr. Thurman pack the bags into his trunk, he was told by Mr. Thurman not to touch that black bag and not to go into it; correct?
A. Correct.
Q. You also learned from your investigation, when you searched that black bag, that all the identifying material in that black bag connected it with Mr. Thurman; correct?
MS. BUNKER: Objection. There has been no testimony that --
THE COURT: Overruled, he has answered the question.
A. Could you repeat it?
(Last question read)
A. Yes.
Q. You learned the receipt in there was from Mr. Thurman's, correct?
A. Yes.
Q. You learned that the address book and contents was related to Mr. Thurman?
A. Correct.
Q. No identifying features relative to Mr. Allen?
A. No.
THE COURT: No there was not?
A. No, there were not.

(Nov. 16, 2004, Trial Tr. at 81-83.)  And when he cross-examined Agent Kelley, the following

exchange took place:

Q. Throughout your discussion with Mr. Allen, Mr. Allen never admitted to possessing those drugs; correct?
A. Correct.
Q. He consented to your search immediately; correct?
A. Correct.
Q. The consent was not in writing, he did it verbally?
A. Correct.
Q. Now, when Mr. Allen spoke with you, he indicated there may be drugs in the car?
A. Correct.
Q. He indicated he did not know if there were drugs in the car; correct?
A. Correct.
Q. And he never told you that there were drugs in the car; correct?
A. Correct.

17

(<u>Id.</u> at 261-62.)

There is nothing in Allen's arguments or the record that convinces me that there is something that his attorney could have "worked out."  It must be presumed that the testimony that Allen gave under oath at the suppression hearing was honest and the truth as he knew it.  Perhaps, Allen is suggesting that he would only testify at trial if he could change that testimony and say that he absolutely consented to the search.  Maybe the thrust of Allen's argument is that he would have had counsel not elicit at trial a recognition by these two witnesses that Allen fully consented to the search and, therefore, exhibited an attitude suggestive of someone who was unaware of the presence of contraband in the bags.  Instead, assuming Allen took his oath at the suppression hearing seriously, he would have testified at trial that he did not consent to the search.[4]  It is just not clear giving the travel of Allen's criminal case what Allen's theory is about Counsel's advice/tactics regarding the pros and cons of testifying at the suppression hearing and/or the trial.

### 5.    Conflict of interest

Allen's final discontent with his trial attorney is that he should have withdrawn from representation at the onset of a conflict of interest.  (Sec. 2255 Mot. at 9, "Attachment A.")  Allen explains that it was not until after testimony had begun that Allen directed his attorney to withdraw and it was at this juncture that his attorney attempted to make the Court aware that there was a potential conflict of interest.  (<u>Id.</u> at 10.)  He contends that at this time counsel failed or refused to adequately identify to Judge Carter the source of the conflict, a source counsel belatedly described in a written submission.  (<u>Id.</u>)  In this motion counsel blamed the conflict on

---

[4]    Allen does not come out and state that he would have forgone the motion to suppress thereby giving him a clean slate with regards to conveying his version of events at trial.

Allen's "confrontational and erratic behavior" which prevented counsel from effectively communicating with Allen.  (Id.)  Allen believes that had counsel revealed this problem earlier on "counsel would have been relieved prior to sabotaging [Allen's] case at trial."  (Id.)  He maintains that this resulted in Allen being told at sentencing that he had contested his guilt at trial and has still not accepted responsibility for his offense.  (Id.)

Allen revisits this concern in his reply brief.  He explains that during trial Allen pointed out several things for counsel to object to, one example being an email that showed that the drug had been mislabeled and could have been a basis for objecting to the admission of these drugs into evidence.  (Reply Mem. at 10.)  Allen felt like his attorney intentionally failed to correct these issues so he told counsel to withdraw.  (Id.)  Counsel attempted to bring Allen's desires to the court's attention and the Court responded: "Too late. I gave you a full opportunity to tell me about any problem. You could not tell me the specific problem. I will not give you other time to speculate on what the problem is. I'm going to bring the jury in to try this case."  (Nov. 16, 2004, Trial Tr. at 179-80.)  "Based upon this conflict," Allen opines, "counsel continuously failed to object to the government's mis[s]tatements and failed to have the government correct known false testimony calling into question the Petitioner's conviction, where it was counsel's actions that prevented Petitioner from being able to testify on his own behalf."  (Reply Mem. at 10.)

The United States' response to this claim (as the claim is set forth in Allen's original pleading) is that it is conclusory regarding the nature of the conflict of interest.  (Gov't Opp'n Sec. 2255 Mot. at 20.)  It also points to the fact that counsel did secure the Court's approval to the withdrawal prior to sentencing.  (Id.)

The Jury verdict was on November 18, 2004.  On December 7, 2004, Allen filed a pro se motion to reserve rights to appeal from conviction and any prior motions for suppression of

evidence.  (Doc. No. 179.)  After listing a lengthy series of complaints he had with the

proceedings to date – primarily highlighting evidentiary issues at trial (id. at 1-4, 6) – Allen

represents to the court that, with it then being seven days since his trial, his attorney had failed to

see him in the time allotted for a motion of acquittal and a motion for a new trial  (id. at 4-5).  He

states that he specifically informed his attorney that "it was not over" after the verdict and was

told that he would be in to see Allen within the week.  (Id.)  Allen indicates there were issues he

wanted his attorney to address during trial but was rebuffed; he represents that he had discovered

new evidence about Bucky's house on Summer Street; he requested the filing of a motion for a

violation of his speedy trial rights and was told that it was denied without being provided the

paperwork; and he asked for transfers which had not been provided.  (Id. at 4-6.)  In this motion

Allen asks for new counsel.  (Id. at 6.)

> The successful motion to withdraw was filed January 4, 2005.   It read:
>
> Defendant's confrontational and erratic behavior has made it impossible for
> counsel to effectively communicate with Defendant. Counsel has received copies
> of the two Bar complaints filed by Defendant and ass[]ociated correspondence
> from Bar counsel which are attached as an aid to the Court. Upon review of these
> documents, counsel concludes that Defendant freely assents to counsel's
> withdrawal.
>
> A number of significant sentencing issues exist in this matter and counsel
> does not want to compromise Defendant's ability to effectively prepare for
> hearing. Defendant suffers from a history of significant mental illness. Therefore,
> counsel believes that Defendant may be eligible for a departure pursuant to
> Federal Sentencing Guidelines Section 5K2.0(a)(4). It may be appropriate for the
> Court to allocate funds for a psychological/psychiatric evaluation to determine
> whether a departure is warranted. Counsel anticipates that in order to have the
> evaluation performed, Defendant must have a functional relationship with
> counsel. Moreover, at this juncture counsel is unable to formulate a response to
> Probation Officer Duff's Presentence Report dated December 30, 2004. The lack
> of communication between counsel and Defendant will adversely affect
> Defendant's rights.

(Mot. Withdraw at 1-2, Crim. No. 04-08-P-S, Doc. No. 189.)  On that date Allen filed the

following letter with the Court:

> I am writing you for a very upsetting matter.  I have addressed you al[]ready for a
> very few of the complaints I have and for reserving my right to appeal and that I
> feel that I have not had effective assistance of counsel.  I did write to the Board of
> Overseers of the Bar.  I did receive a letter back from them as I have not from
> you.  Thus upsetting. In the letter I received from Mr. J. Scott Davis he explained
> that my complaints appear to relate to claims of inef[f]ective assistance of
> counsel, which should be addressed through post-conviction review proceedings.
> Now I am addressing you again as I await review of my complaint to the
> Overseers of the Bar.  For a decision or judgment of inef[f]ective assistance of
> counsel.  Thank you for your time and I'm sorry that I'm upset with you but who
> am I to look to for justice.  I beli[e]ve it is you as the judge.

(Doc. No. 191.)  This letter was sent to Judge Carter.  Judge Singal held a hearing on the motion

to withdraw on January 12, 2005, and orally granted the motion.  (Doc. Nos. 194 & 195.)

"It [is] at least necessary, to void the conviction, for petitioner to establish that the

conflict of interest adversely affected his counsel's performance."  Mickens v. Taylor, 535 U.S.

162, 174 (2002); see also United States v. Burgos-Chaparro, 309 F.3d 50, 52 -53 (1st Cir. 2002).

I credit Allen's account of his discontents with counsel for not pursuing certain evidence and

failing to object to the government's misstatements and correct known false testimony calling

into question the Petitioner's conviction.[5]  It is clear that counsel attempted to articulate the level

of the discontent to Judge Carter as Allen's complaints escalated at trial and Allen concedes that

it was at trial that he first made his direct request that counsel withdraw.  The best I can do is put

this description of the "conflict" in the context of trial counsel's overall performance and the

record reveals that counsel put considerable effort and thought into this case.  It is not

uncommon for these types of evidentiary disagreements to arise between a client and defense

---

[5]        With respect to the assertions that counsel would not pursue speedy trial relief or transfers Allen has failed
to adequately explain the potential basis for this advocacy on counsel's part.

counsel and, surely, not all such disagreements amount to a conflict of interest as that term is applied in the Sixth Amendment context.  I also think that the discussion here of Allen's other § 2255 claims provides further context as to the merits of the tactics and strategy that Allen blames counsel for not pursuing, such as the issue of Allen's potential testimony at trial. With regards to the alleged failure to meet with Allen in the week after the verdict, I note that Allen did perfect a direct appeal and that the motion for a new trial that Allen eventually filed pro se had no merit, as discussed elsewhere in this decision.

**B.      Sentencing Counsel**

###      1.      Failing to pursue objections and preserve issues for appellate review

With regards to his sentencing attorney, Allen's first beef with counsel's performance is that he failed to pursue objections and preserve issues for appellate review apropos the form of the narcotics attributed to Allen and Allen's career offender enhancement. (Sec. 2255 Mot. at 11, "Attachment B.")  With respect to his career offender status, Allen explains that during sentencing counsel did not object to or counter the Court's findings by using records available from the Androscoggin Superior Court and the Maine burglary statutes.  (Id.)  Allen further faults counsel for not properly developing an argument to the effect that the narcotic substance was powder cocaine. (Id.)

In his reply memorandum Allen reiterates his discontent with sentencing counsel's failure to investigate the propriety of the use of the burglary conviction.  (Reply Mem. at 11.)   He explains that at the time of his conviction for the state burglary the state statute defined burglary as a Class A crime if the defendant was armed with a firearm; a Class B crime if the defendant carried any other dangerous weapon and burglarized a dwelling; and all other burglaries were considered Class C.  (Id. at 11-12.)   Allen believes that the Court would have concluded that his

22

burglary was a Class C crime and not a crime of violence under U.S.S.G. § 4B1.1.  (Id. at 12.)
He also maintains that all of the conduct forming the basis for a career offender status must be
charged in the charging document for the count and that counsel should have pressed for relief
vis-à-vis this deficiency. (Id.)   This 'deficiency,' Allen postulates, ultimately prevented Allen
from getting relief apropos the retroactive adjustment of the crack cocaine sentencing guideline.
(Id.)   Allen notes that during sentencing the United States Assistant Attorney remarked: "So to
the extent that drug quantity is relevant, it sounds like [sentencing counsel] is conceding the
career offender status, in which case the statutory maximum penalty of life in prison dictates the
base offense level of 27 rather than drug quantity."  (Sentencing Tr. at 21.)

      Allen also cites to the following exchange between his counsel, Attorney Rodway, and
the Court at the pre-sentencing conference:

> MR. RODWAY: … At the last conference I had objected to the career offender
> status and I would like to press that objection. I don't see a basis for it. I wanted to
> take some time to read the new case from the U.S. Supreme Court, Shepard, and
> that does not help us.
> THE COURT: Issue 3 is whether the defendant is subject to career offender
> enhancement. The fact impacts the other issues that I preserved, whether several
> of his criminal convictions were related.
> MR. RODWAY: It does not make a difference once you find him career offender.
> THE COURT: If he is a career offender, it doesn't make a difference?
> MR. RODWAY: It does not, he becomes a category 6. The drug quantity does
> matter, that affects the statutory maximum. The base offense level is 37 and 40 is
> 30 years; 34, 20 years. So where I think we get to is, we are talking about the
> statutory minimum or statutory maximum , and we have a pretty good trial record
> for the Court to determine quantity.

(Pre-Sentencing Conference Tr. at 4.)

      As for the identity of the drug and this ineffective assistance claim, there was a lengthy
discussion during the sentencing hearing sparked by sentencing counsel's effort to persuade
Judge Carter to treat the drugs as something other than crack.  (Sentencing Tr. at 5, 7-11.)  The

Court concluded that the jury had made a determination that the substance involved in both conspiracy counts was crack. (Id. at 28.)  See also infra Claim B.2.  Counsel took his best shot on this issue and was rebuffed by the court; there is no Strickland deficiency here.

With respect to the burglary conviction, I note that sentencing counsel did in fact attempt to persuade Judge Carter to exercise his discretion and sentence Allen to a lower term based on his argument that Allen's criminal history was peppered with nothing but petty offenses. (Sentencing Tr. at 12.)  With regards to the predicate offense of burglary counsel argued that apropos this conviction "the potential for violence in a burglary like that is light." (Id. at 12.)

The question for purposes of adjudicating this 28 U.S.C. § 2255 motion is whether or not Allen's attorney was ineffective under the Strickland standard for not raising a challenge to the use of the Paragraph 26 conviction.  The problem for Allen is that at the time of his October 21, 2005, sentencing in front to Judge Carter, in view of United States v. Sawyer, 144 F.3d 191 (1st Cir. 1998) and United States v. Fiore, 983 F.2d 1 (1st Cir. 1992),  First Circuit law was clearly against him on challenging the use of this burglary conviction. (See Sentencing Tr. at 12.)  The First Circuit recently reversed course on this approach in  United States v. Giggey, 551 F.3d 27, 28 -29 (1st Cir. 2008), but counsel does not run afoul of Strickland for not raising a claim foreclosed by circuit precedent, see Campbell v. United States,  108 Fed.Appx. 1, 5, 2004 WL 1888604, 3 (1st Cir. Aug. 25, 2004) (citing  United States v. Campbell, 268 F.3d 1, 7, n. 7 (1st Cir.2001));  Taveras v. United States, 432 F.Supp.2d 140, 143 (D. Me. 2006); see generally United States v. Fields, 565 F.3d  290,  295-98 (5th Cir. 2009).[6]

---

[6]     Indeed, even if counsel has preserved this argument throughout Allen's prior proceedings, he would not be entitled to 28 U.S.C. § 2255 relief, as his direct appeal was decided on November 17, 2006, well before Giggey. Thomas v. United States, Civ. No. 9-58-P-S. Crim. No. 4-67-P-S, 2009 WL 1149615, 3 -4  (D.Me. Apr. 28, 2009) (Recommended Decision).

2.      **Failing to make discovery demands regarding trial materials**

Allen also faults his sentencing attorney for not making discovery demands relating to trial materials that were necessary to present effective sentencing arguments. (Sec. 2255 Mot. at 11, "Attachment B.")  He explains that his attorney had an opportunity to request material that trial counsel failed to seek and he could have filed discovery motions that could have resulted in evidence that could have led to the court making different drug quantity and career-offender findings.  (Id.)  As this claim stood when the United States prepared its answer to Allen's 28 U.S.C. § 2255 motion it was entirely conclusory.

In his reply brief Allen expands on this claim by giving the example of records in the United States' possession showing that Special Agent Godbout asked Rita Dillingham (Bonin) to travel with him and Agent Slivinski to a street in Lewiston, Maine. (Reply Mem. at 13.)  During this operation Bonin was asked if she recognized anyone on the street and she only identified Allen's co-defendant Curt Thurman as being involved in drug trafficking.  (Id.)  Another document would have shown that Jeff Dillingham made a statement that Allen would go to 85 Howard Street with a couple of eight balls of crack, thereby demonstrating that the drugs possessed by Allen were for personal use and not distribution.  (Id.) He adds:

> Unfortunately the same document also shows that "Dillingham stated that approximately **two times per week [Petitioner] would meet with Thurman at 85 Howard Street**", and that when Petitioner went to drop off product for Thurman[] [Petitioner] didn't know who he was dropping the product off to in Bangor, which is contrary to the testimony given by the Dillinghams.  These documents would also have shown that "Dillingham had been going to the Motel for the last couple of weeks", showing that Thurman did not move to the Summer Street location that was referred to by the witnesses at trial.  Ultimately the judge might have held Petitioner to a lesser quantity which would have been relevant, had counsel objected to the court's finding of facts outside the prior convictions indictment. …

(Id.)

25

I am sure that I am not alone in having difficulty following the thread of the above passage; the United States has not had an opportunity to address the elaboration of this ground in Allen's reply.  There is nothing in this segment of Allen's reply that touches upon Allen's career offender status.  Allen's focus is on the drug quantity attribution. However, the jury verdict form attributed 245.0 grams of cocaine base to Allen as to Count I and 201.8 grams of cocaine base as to Count II. (See Crim. No. 04-8-P-S, Docket No. 173.)[7]  Totaling 446.8 grams, this was the predicate for Allen's Base Offense Level of 34 according to the Presentence Report.  (PSI ¶ 14.)  During the sentencing hearing Allen's attorney did attempt to convince Judge Carter to only hold Allen responsible for 3.5 grams of crack (only 2.5 grams if it was narrowed to the delivery to Patricia Poulin of a 8th ball of crack) thereby ducking the minimum mandatory sentence. (Sentencing Tr. at 15, see also id. at 24-25.)[8]   The Court found that the drug quantities chargeable to Allen was 446.80 grams of crack cocaine base requiring a base offense level of 34,

---

[7]       The case was tried in the interregnum between Blakely v. Washington, 542 U.S. 296, 303 (2004)  and United States v. Booker, 543 U.S. 220 (2005).  During the sentencing Judge Carter had the following exchange with the prosecutor, Assistant United States Attorney Bunker:

> MS. BUNKER: …In regard to drug quantity, I won't go into that too much, the government agrees with probation that the Court should adopt the special verdict of the jury and find that drug quantity is 446.8 grams, or whatever the quantity was, to the extent that drug quantity is relevant to determining the applicable guideline range.
> THE COURT: This sentencing record should reflect clearly, I think, that due to the fact that this trial in temporal between Blakely and Booker, the Court was cognizant of the issue about whether or not there should be a jury determination of a crucial issue of fact, to the extent of sentence, and did in fact submit that issue to the jury and the jury returned a verdict that reflected its determination as to the quantity of crack involved in the offense conduct.
> MS. BUNKER: And although our position—we maintain that the Court could find by a preponderance of the evidence a larger quantity, and I just put that in my brief as an aside, it is safer course in this case, since the jury found proof beyond a reasonable doubt, that –
> THE COURT: I want the record to reflect that we all know that the jury determined that quantity. The question is whether or not I accept that or some other standard of my own to determine the quantity.
> MS. BUNKER: So to the extent that drug quantity is relevant, it sounds like Mr. Rodway is conceding the career offender status, in which case the statutory maximum penalty of life in prison dictates the base offense level of 27 rather than drug quantity.

(Sentencing Tr. at 20-21.)
[8]       Allen is not reviving an argument that the base involved was not "crack" within the meaning of the guidelines.  (Sentencing Tr. at 8- 11.)

26

citing the jury verdict.  (Id. at 28 -29.)  Judge Carter noted:  "The determination of career offender status is what drives the application of the advisory guideline range with respect to the term of incarceration and certain elements of the sentence." (Id. at 31.) And this last observation is the bottom line for Allen with regards to the Strickland prejudice inquiry; it would not have made any difference even if counsel had made a more successful challenge to drug quantity attribution envisioned by Allen because of his status as a career offender.

    **3.**    **Failing to utilize documents for post-trial motions/failure to preserve these documents**

    Allen's final complaint with sentencing counsel concerns documents that were given to him that proved, in Allen's view, witness tampering and obstruction of justice by Allen's ex-wife.  (Sec. 2255 Mot. at 12, "Attachment B.")  He also identifies documents:

> Showing that another person owns a home on the very same street, has the same legal name as the defendant's alias, was the person living at the address 72 Summer Street disclosed during trial where defendant **purportedly** allowed Patricia Poulin to purchase narcotics.  Not only did counsel fail or refuse to move for a new[] trial based on newly discovered evidence, but also counsel failed to preserve these original documents as part of the file.

(Id.)  Allen maintains that when appellate counsel asked sentencing counsel for these documents he was told that they were in storage and that they would take some time to retrieve when in fact they were no longer in his possession.  (Id.)

    In his reply memorandum Allen relates that the letters that he gave his attorney stated that his ex-wife told Jeff and Rita Dillingham to hang Allen and "also stated now look who's on top, being that she had the Petitioner's children, was living in the house that was awarded to Petitioner in the divorce." (Reply Mem. at 14.)  He represents that he expressly instructed his counsel to file a new trial motion based on this newly discovered evidence and he failed to do so.  (Id. at 14-15.)

Given Allen's failure with regards to his first motion for a new trial I am thoroughly skeptical that Judge Carter would have entertained a second motion for a new trial based on the allegations of Allen's ex-wife's treasonous undertakings even if the documents were in hand. And, as already explained above, the evidence Allen highlights regarding the Summer Street address would have had negligible impact at trial, let alone provide the type of basis justifying a motion for a new trial.

## C.    Appellate Counsel

As for the performance of Allen's attorney on appeal, Allen incorporates the description of his grounds addressing the performance of trial and sentencing counsel and represents that his attorney for the appeal was fully briefed on these concerns.  (Sec. 2255 Mot. at 4.)  He complains that appellate counsel failed or refused to present these issues to the First Circuit, thereby depriving Allen of a meaningful appeal.  (Id.)   In his reply memorandum, Allen is more specific and states the one issue appellate counsel should have raised was that regarding his career offender enhancement, citing Federal Rule of Criminal Procedure 52(b)'s plain error standard. (Reply Mem. at 15.) He clarifies that he is not suggesting that appellate counsel should have raised claims of ineffective assistance of counsel.  (Id.)

As initially pled, the kitchen-sink approach to identifying appealable arguments is not specific enough to warrant discussion under Strickland.  As for the more precise career offender challenge, as already explained above, counsel cannot be criticized vis-à-vis the Strickland performance prong for not raising a challenge foreclosed by First Circuit precedent; Allen's appeal was decided November 17, 2006, and Giggey was decided on December 22, 2008.  See supra Claim B.1.

*Conclusion*

For the reasons above I recommend that the Court deny Allen 28 U.S.C. § 2255 relief.  I

further recommend that a certificate of appealability should not issue in the event Allen files a

notice of appeal because there is no substantial showing of the denial of a constitutional right

within the meaning of 28 U.S.C. § 2253(c)(2).

NOTICE

A party may file objections to those specified portions of a magistrate
judge's report or proposed findings or recommended decisions entered pursuant to
28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought,
together with a supporting memorandum, within ten (10) days of being served
with a copy thereof.  A responsive memorandum shall be filed within ten (10)
days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de
novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
June 8, 2009                            U.S. Magistrate Judge

29